

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00387-CV

IN THE INTEREST OF E.S., A
CHILD

----------

### FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 323-97666J-12

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

This is an ultra-accelerated appeal[2] from an order terminating the parental

rights of Appellant Mother to her son Elijah.[3]  In one issue, Mother argues that

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we are using a pseudonym for the minor child that is the subject of this suit.  See Tex. R. App. P. 9.8(b)(2).  We are also using the generic labels of "Mother" and "Father" instead of the names of the parents to further the spirit of this rule.

the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights to Elijah was in his best interest. We will affirm.

## II. BACKGROUND

Elijah was born on December 14, 2012, and according to CPS investigator Mary Houseman, she received a referral to investigate Mother and Father due to possible "medical neglect as well as physical abuse." Houseman said that Mother had a history with CPS dating back to 2008 regarding multiple children. By Houseman's account, CPS was concerned for Elijah's well-being because of an open case pertaining to his older sister. CPS had received a referral regarding Sister over her having been transported to John Peter Smith Hospital in early 2012 with "hematoma and swelling to the left side of her head, and her stomach [being] rock hard and extended." Hospital personnel determined that Sister, ten months old at the time, had a broken clavicle and fractured skull. They also revealed that Sister had a rare genetic liver disease known as Glycogen Storage Disease (GSD) and that she was in need of a liver transplant. These conditions in Sister concerned CPS for Elijah because doctors had told Mother and Father that it was highly probable that any other children that they bore would also have GSD and that all of their children should be tested at birth.

CPS had also expressed to the parents their need to have themselves and their expected baby, Elijah, tested. Despite CPS's instructions, Houseman said that neither Mother nor Father told hospital personnel that Elijah needed to be

2

tested. Houseman testified that Mother admitted to her that she had not informed hospital personnel about Elijah's need to be tested.

Regarding the parents' involvement with Sister, Houseman said that despite Sister having a 24-hour nurse due to her need for a liver transplant, both Mother and Father had reported to her that they had not been to any of Sister's medical appointments for six months. Houseman also stated that six months into Sister's case, neither Mother nor Father had completed their service plans necessary for the return of Sister. Due to their lack of involvement with Sister and their failure to report Elijah's need for medical testing to hospital personnel pertaining to his possibly having the "life-threatening liver disorder" GSD, a court granted CPS's motion for ex parte removal of Elijah from the parents' care.

Houseman said that the parents' reaction to learning of Elijah's removal was indifferent, and instead of paying attention to her about Elijah's removal, they "both sat on separate beds and . . . watch[ed] the TV as [Houseman sat] in front of them" explaining the situation. Houseman further averred that CPS had also investigated Mother concerning Elijah's older stepsister. That investigation, conducted in 2008, pertained to Stepsister's remaining in a dangerous environment and allegations that Father had sexually abused her.

Fort Worth Police Department Patrol Officer R. Hoeppner also testified at trial. According to Hoeppner, he responded to a domestic disturbance call reported at 2:37 a.m. on August 11, 2013—a third-party witness called 9-1-1 and reported an altercation that involved Mother and Father. According to Hoeppner,

3

he made contact with Mother, who reported that Father had become angered because Mother and Cousin wanted to go to the "West Side to hang out." Hoeppner averred that Mother had described to him how Father had torn her keys from her belt loop, gotten out of the vehicle and walked to the passenger side, opened the door, and grabbed Mother. Allegedly, he then "threw her onto the concrete." Hoeppner said that Cousin expressed that Father had also assaulted her. Cousin told Hoeppner that she had seen Father "punch" Mother in the chest and that when Cousin came to her aid, he pushed her down as well. At some point during the ruckus, after Father had pushed Mother down, Mother got up and ran, and Father chased her. Hoeppner said that both Mother and Cousin had sustained injuries. Father denied that he had assaulted either of them.

Hoeppner arrested Father, and he was charged with two counts of assault. Hoeppner averred that at that time, Father also had warrants out for his arrest related to unpaid traffic violations. Hoeppner said that Mother had been drinking alcohol that night.

Court Appointed Special Advocates (CASA)'s case supervisor Roderick Smith testified that he had worked on Elijah's case for roughly a year before trial. Roderick said that because of domestic violence issues in the parents' home life, they had been ordered to attend domestic violence classes following a permanency review in October 2013. Smith said that after the permanency review, in November 2013, Mother reported to him that Father "got upset and

4

tore up her home and stole her money." This concerned Smith because despite a court order, neither Father nor Mother had attended any of their respective domestic violence classes.

Smith testified that he was familiar with the incident wherein Father had pushed Mother to the ground in August 2013. He averred that Mother had admitted to drinking and "partying" that night and that her attempt to "drink and drive" was troubling. Smith said that domestic violence between Father and Mother "seem[ed] as if it [was] a pattern." He also testified that Mother had had "several run-ins with CPS in Abilene" concerning Sister and Stepsister before the family moved to Fort Worth. Smith further stated that Mother had "missed visits" with Elijah since his court-ordered removal. And Smith said that despite programs and available financial support from CASA to provide a proper home environment for Elijah, Mother had failed to take advantage of these programs.

Smith testified that it was CASA's recommendation that both parents' parental rights to Elijah be terminated. The trial court took judicial notice of CASA's written recommendation, dated December 16, 2013, that both parents' rights be terminated.

Gladys Demus, a conservatorship worker for CPS assigned to Elijah's case, testified at trial as well. Demus said that she also worked on Sister's case prior to Elijah's removal. Like other witnesses, Demus said that CPS had grave concerns for Elijah given Sister's unexplained broken clavicle and skull fracture and the fact that Elijah needed testing at birth for the same liver disease that

Sister died from in 2013. CPS's concerns became more prominent due to the parents' lack of participation in services regarding Sister. Further, according to Demus, Sister endured several dozen tests and doctor visits for treatment concerning her GSD and yet the parents only attended two of these appointments. Demus said that the parents' same pattern of participation in Sister's services continued regarding Elijah—ranging from sporadic participation to no participation at all.

Specifically as to Mother, Demus said that Mother was "standoffish" with her and that she seem disinterested in interacting with Elijah during the visits that she actually did attend. Because of a lack of communication from Mother to Demus during Sister's related services, Demus said that she was unable to determine whether Mother was properly engaged in prenatal care when pregnant with Elijah. Demus also said that because Mother would not communicate with her, she could not determine whether Mother had a stable living environment to provide for Elijah. Demus averred that the only visit she was able to coordinate with Mother to observe her living arrangements occurred at an apartment that Mother claimed to be her home, but several unidentified people appeared to be living in the one-bedroom apartment, and there existed inadequate furniture and clothing for Elijah. Demus also said Mother had failed to provide a lease agreement to demonstrate that the apartment was hers.

According to Demus, when she inquired, Mother denied that the August 2013 domestic-violence incident ever happened. Demus further added that she

and Mother's attorney had "expressed to [Mother] how important it was for her to tell" doctors that Elijah needed to be tested for GSD. Demus testified that despite doctors' and CPS's urging that both parents also be tested as carriers of the GSD gene, neither had done so. Demus said that it was her opinion that it was in Elijah's best interest that both parents' parental rights to Elijah be terminated.

Demus went on to testify that Elijah had been in the same foster home since he was placed in foster care after the removal and that it was the only home he had ever known. Demus stated that the foster home was a safe place for him. She also averred that the foster parents had attended all court hearings concerning Elijah and had expressed an interest in adopting him and were licensed to do so. Demus further stated that the foster parents had appropriately provided for Elijah's physical needs, including routinely taking him to physical therapy due to "stiffness" he had suffered from birth. She said that under the foster parent's care, Elijah was "walking, . . . getting into everything, . . . very verbal, [and] very active." She said he was developmentally on target. In contrast to Mother's seeming living conditions, the foster parents live in a large home where Elijah "ha[d an] area where it's just his area where he play[ed]. He ha[d] a nice room, a lot of clothing, [and] a lot of toys." According to Demus, the foster mother was a stay-at-home mom who spent a lot of time with Elijah. Demus averred that the foster home is safe and stable and that the foster parents were able to meet Elijah's physical, emotional, and financial needs.

7

Father testified that he and Mother had broken off their relationship a few months before the termination hearing. By Father's account, he had completed all of his services regarding both Sister and Elijah and he had notified doctors at Elijah's birth regarding Sister's liver condition. Father also stated that he had attended all of Sister's doctors' visits. He said that he and Mother relinquished their parental rights to Sister so that she would have "a better shot at getting a liver transplant."

Father averred that the August domestic violence incident was his attempt to prevent Mother from going to the "West Side to some guy's house" to continue partying and that Mother had been drinking. He said that although he "shoved" Mother, she "never fell, or whatever." Father stated that he was currently unemployed pending assault charges.

As to Sister's injuries, Father testified that Sister had fallen off of a bed and sustained the broken collar bone, that he and Mother did not take Sister to the hospital for another two months, and that they had only taken her there because Mother had discovered that Sister had "swelling in her head." Father did not know how Sister's skull became fractured.

Mother testified that she had been regularly attending court-ordered counseling and co-parenting classes and that her only absences were due to her work schedule or unavailable transportation. According to Mother, only a week had gone by between Sister falling from the bed and the parents taking her to the

hospital. Mother stated that she had had anger issues in the past and that at one point, she had disciplined Stepsister with a sandal and left bruises on her thigh.

Contrary to Demus's testimony, Mother said that she had seen Elijah every two weeks for two hours at a time since his removal. Mother said that CPS employees were "lying" about her attendance to these visits and that they wanted to make her "look bad." Specifically regarding Demus, Mother said that she felt "like [Demus] just has a personal problem with" her. Mother admitted that she had been drinking the night of the August domestic violence incident. Mother said that she had not gotten GSD testing because doctors had told her that it was her "option." Mother said that she worked twelve-hour days and that if necessary, she would get a second job to support Elijah if he was returned to her care. She also said that she did not own a vehicle.

The trial court found that both parents had knowingly placed or knowingly allowed Elijah to remain in conditions or surroundings which endangered his physical and emotional well-being; that both parents had engaged in conduct or knowingly placed Elijah with persons who engaged in conduct which endangered his physical or emotional well-being; and that both parents failed to comply with provisions of a court order that specifically established the actions necessary for either of them to obtain Elijah's return. The trial court also found that termination of both Mother's and Father's parental rights in Elijah was in his best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West 2014). Mother's appeal followed.

9

### III. DISCUSSION

In her sole issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights to Elijah was in his best interest. We disagree.

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*,

10

384 S.W.3d at 802.  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination is in the best interest of the child.  *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in the light most favorable to the finding and judgment.  *Id.*  We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.  *Id.*  We disregard all evidence that a reasonable factfinder could have disbelieved.  *Id.*  We consider undisputed evidence even if it is contrary to the finding.  *Id.*  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.  *See id.*  "A lack of evidence does not constitute clear and convincing evidence."  *E.N.C.*, 384 S.W.3d at 808.

11

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and we do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d

12

239, 250 (Tex. 2013).  Nonexclusive factors that a factfinder in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.,* 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a

13

finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

Here, a multitude of the *Holley* factors supports the trial court's best interest finding. *See Holley*, 544 S.W.2d at 371–72.

Because Elijah is less than two years old, the trial court could not have inquired into his desires. This factor does not weigh in favor of termination. *See T.G.R.-M.*, 404 S.W.3d 7, 16–17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (reasoning that because child was removed two months after birth and his desires could not be determined, first *Holley* factor did not weigh heavily in Department's favor).

As to Elijah's physical and emotional needs now and in the future, the record evidence demonstrated that Mother lacked transportation, adequate furniture, and stable housing for Elijah. *See id.* ("The case worker . . . testified that during the time T.G.R.-M. was in the Department's custody, the mother had not demonstrated an ability to provide a stable environment or reliable source for food, clothing, shelter, and emotional support."). Furthermore, Mother failed to inform hospital personnel, and did not request personal genetic testing herself, regarding a disease that Sister died from. This is despite the fact that CPS workers, doctors, and her own attorney expressed that she do so. Sister suffered through numerous tests and treatments before succumbing to the disease before she reached the age of two. Other evidence demonstrated that Mother waited between one week and two months before taking Sister to the

14

hospital for a broken clavicle and a fractured skull. In short, the evidence demonstrated that Mother has a consistent pattern of neglecting the physical and emotional needs of her children. This *Holley* factor weighs heavily in favor of the finding that termination of Mother's parental rights to Elijah was in his best interest.

Regarding any current and future emotional and physical danger to Elijah, evidence at trial demonstrated that Mother allowed herself to remain in domestic violence situations and was willing to drive while intoxicated. There is evidence in the record that at least two domestic violence situations transpired after Elijah's removal. Further, multiple CPS workers testified that Mother failed to complete court-ordered domestic violence counseling. *See In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.) (reasoning that evidence that mother had "shown no desire or taken any action to modify her behavior" pertaining to domestic violence supported trial court's best interest finding). And under this third *Holley* factor, the trial court could have also taken into account Mother's failure to provide verification of housing. *See In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.) ("Although [mother] claimed she was living at home at the time of trial, the trial court could have discounted this testimony, given that she . . . never provided proof of a lease."). Moreover, Mother's own testimony was that she had bruised her oldest daughter's thigh by angrily

15

spanking her with a sandal. This *Holley* factor weighs in favor of the finding that termination of Mother's parental rights to Elijah was in his best interest.

As to Mother's parental abilities, the record revealed that Mother had not fully completed the tasks in her service plan and had missed numerous scheduled visits with Elijah. *See In re M.D.*, No. 02-14-00305-CV, 2015 WL 729506, *1 n.5 (Tex. App.—Fort Worth Feb. 19, 2015, no pet.) (mem. op.) ("In the time period leading up to the trial, [appellant] had not been visiting [child]."). CPS workers' descriptions of Mother's conduct toward Elijah painted a picture of a disinterested and "standoffish" parent more concerned with the television than Elijah's removal. There was also evidence that Mother did not adequately engage in proper prenatal care when she was pregnant with Elijah. The record further revealed that Mother had previously relinquished her parental rights to Sister before Sister's death. And this occurred after having allowed Sister to suffer untreated from a life-threatening disease that was discovered when the parents took Sister to the hospital with a broken clavicle and fractured skull— injuries that Sister had suffered through for weeks, if not months, and for which Mother had no explanation. Further, CPS has investigated neglect and abuse from Mother toward three children. This *Holley* factor weighs in favor of the finding that termination of Mother's parental rights to Elijah was in his best interest.

With regard to available programs, there was testimony that Mother had not completed any of the tasks on her service plan. There was testimony that

she did not complete domestic violence counseling. There was testimony that she did not attend all the required parent-support group meetings. And, although given information about CASA's programs to financially help with adequate furniture and supplies for Elijah, Mother did not avail herself of this opportunity. This *Holley* factor weighs in favor of the finding that termination of Mother's parental rights to Elijah was in his best interest.

Regarding the stability of Elijah's placement and the foster parents' intentions, there was testimony that Elijah had been in the same foster home since he was placed in foster care after removal and that it was the only home he had ever known. Further testimony revealed that Elijah's foster home was a safe and stable place for him and that the foster parents, who were seeking to adopt Elijah and were licensed to do so, had attended all court hearings concerning him. There was also testimony that the foster parents had appropriately provided for Elijah's physical needs, including routinely taking him to physical therapy due to "stiffness" that he has suffered from birth, and that he is now developmentally on target. These *Holley* factors also weigh in favor of the finding that termination of Mother's parental rights to Elijah was in his best interest.

When viewing this evidence in light of the entire record under the legal sufficiency standard, or when viewing the evidence in a light most favorable to the trial court's finding under the factual sufficiency standard, we conclude that the trial court could have produced a firm belief or conviction that termination of

17

Mother's parental rights to Elijah was in his best interest. *See J.P.B.*, 180 S.W.3d at 573; *H.R.M.*, 209 S.W.3d at 108. We overrule Mother's sole issue.

## IV. CONCLUSION

Having overruled Mother's sole issue on appeal, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED: May 7, 2015